1
2
3
4
5
6
7

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

8   FREDDIE LEE TAYLOR,                         No. C-92-1627 EMC

9           Petitioner,

10                                              <u>**DEATH PENALTY CASE**</u>

          v.

11   RON DAVIS, Acting Warden of the California    **ORDER RE GUILT PHASE CLAIMS**
     State Prison at San Quentin,

12

13           Respondent.
     _____/

14

15                        I.   <u>INTRODUCTION</u>

16          Petitioner was convicted and sentenced to death for the robbery, attempted rape, and murder

17   of an 84-year-old woman in January 1985.  The California Supreme Court affirmed Petitioner's

18   conviction and death sentence in 1990.  *People v. Taylor*, 52 Cal. 3d 719 (1990).  Petitioner's state

19   petition for writ of habeas corpus was denied in September 1990; his petition for a writ of certiorari

20   was denied by the United States Supreme Court in October 1991.

21          Petitioner filed his first federal Petition for Writ of Habeas Corpus on July 10, 1995.  His

22   First Amended Petition was filed on April 30, 1997, and his second state petition was filed on June

23   27, 1997 with the California Supreme Court.  The second state petition was denied on July 16, 2003.

24   All of the claims were denied on the merits, and certain claims were also denied on state procedural

25   grounds.  Petitioner's Second Amended Petition was filed in federal court on March 12, 2004; a

26   portion of that petition was found to be unexhausted.  Petitioner's third state habeas, filed on

27   September 12, 2005, was denied on September 11, 2013.

28

**United States District Court**
For the Northern District of California

Having exhausted all of his claims in state court, Petitioner returned to this Court. Now before the Court are Petitioner's record-based guilt phase claims, specifically Claims 3(A), 12(C), 12(D) and 15(B). For the following reasons, Claims 12(C), 12(D) and 15(B) are **DENIED**. Claim 3(A) is **GRANTED**.

## II.   **FACTUAL BACKGROUND**[1]

Carmen Carlos Vasquez, an 84-year-old widow, was found dead by her son on the afternoon of January 22, 1985. She was severely beaten, and the cause of death was determined to be traumatic head and neck injuries. Vasquez also had injuries consistent with rape, including a swollen and bruised genital area, and areas of hemorrhage in her vaginal wall. Additionally, her underpants were torn. The rape kit did not reveal semen, sperm or foreign pubic hairs.

The prosecution's evidence showed that the intruder had entered via a rear door at Vasquez's home, breaking the glass in the door. Petitioner's palm print was found on a piece of broken glass; his fingerprints were found on the inside latch of the screen door and on the doorjamb between the kitchen and the living room. The parties stipulated that Petitioner owned a pair of shoes within the class of shoes that could have left a shoe print in the house. Petitioner's grandmother lived across the street from Vasquez, and Petitioner visited his grandmother the evening before Vasquez's body was found.

The defense chose not to present evidence, instead arguing that the prosecution had not met its burden of proving guilt beyond a reasonable doubt. Defense counsel pointed to unidentified fingerprints and a footprint that had been found in the house, and argued that someone else could have been the killer.

Petitioner was convicted of first degree murder, robbery, attempted rape, and three counts of burglary. The jury also found true three prior conviction enhancements, and two special circumstances (murder while the defendant was engaged in the commission or attempted commission of a robbery, and murder while the defendant was engaged in the commission or attempted commission of a burglary). A third special circumstances allegation – that the murder was

---

[1] The following facts are taken from Petitioner's direct appeal to the California Supreme Court. *People v. Taylor*, 52 Cal. 3d 719, 729-31 (1990).

United States District Court

For the Northern District of California

1     committed while defendant was engaged in the commission or attempted commission of attempted

2     rape – was found not true.  The same jury sentenced Petitioner to death.

### III.    <u>STANDARD OF REVIEW</u>

4     The habeas statute authorizes this Court to review a state court criminal conviction "on the

5     ground that [the petitioner] is in custody in violation of the Constitution or laws or treaties of the

6     United States." 28 U.S.C. § 2254(a).[2]  The purpose of the writ of habeas corpus is to "protect[]

7     individuals from unconstitutional convictions and . . . to guarantee the integrity of the criminal

8     process by assuring that trials are fundamentally fair." *O'Neal v. McAninch*, 513 U.S. 432, 442

9     (1995); *see also Brecht v. Abrahmson*, 507 U.S. 619, 632-33 (1993).  Because federal habeas review

10    delays finality and burdens state-federal relations, habeas doctrines must balance the protection from

11    unlawful custody the writ offers against the "presumption of finality and legality" that attaches to a

12    state-court conviction after direct review.  *See Brecht*, 507 U.S. at 635-38; *McCleskey v. Zant*, 499

13    U.S. 467, 490-91 (1991).  Accordingly, a federal habeas court must in most cases presume that state

14    court findings of fact are correct. 28 U.S.C. § 2254(d).  In contrast, purely legal questions and

15    mixed questions of law and fact are reviewed *de novo*.  *See Swan v. Peterson*, 6 F.3d 1373, 1379

16    (9th Cir. 1993), *cert. denied*, 513 U.S. 985 (1994).  In such circumstances, and when the state court

17    has made no factual findings regarding the claim at issue, petitioner bears the burden of proving, by

18    a preponderance of the evidence, the facts necessary to support his claims.  *See, e.g.*, *Garlotte v.*

19    *Fordice*, 515 U.S. 39, 46-47 (1995).

20    Even if a petitioner meets the requirements of Section 2254(d), habeas relief is warranted

21    only if the constitutional error at issue had a substantial and injurious effect or influence in

22    determining the jury's verdict.  *Brecht*, 507 U.S. at 638.  Under this standard, petitioners "may

23    obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based

24    on trial error unless they can establish that it resulted in 'actual prejudice.'" *Id.* at 637 (citing *United*

25    *States v. Lane*, 474 U.S. 438, 439 (1986)).

---

[2] This case predates the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), and thus AEDPA's standard of review does not apply.

United States District Court
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## IV.    DISCUSSION

A.    Claim 3(A)

In Claim 3(A), Petitioner asserts that his right to due process was violated by the trial court's failure to *sua sponte* conduct a hearing on Petitioner's competence to stand trial.  According to Petitioner, evidence available prior to and during trial raised doubts as to his competence, and should have triggered the trial judge to order a competency hearing.

A criminal defendant has a constitutional due process right not to be tried or convicted while incompetent to stand trial.  This right assures that a defendant has: (1) a rational, as well as factual, understanding of the nature and object of the proceedings against him; (2) the present ability to consult with counsel with a reasonable degree of rational understanding; and (3) the present ability to aid in the preparation of his defense.  *Drope v. Missouri*, 420 U.S. 162, 171–72 (1975).  Protecting this right is "fundamental to an adversary system of justice."  *Id.* at 172.  Due process requires a trial court to conduct a competency hearing if it has a "bona fide doubt" concerning the defendant's competence.  *Pate v. Robinson*, 383 U.S. 375, 385 (1966); *accord Maxwell v. Roe*, 606 F.3d 561, 568 (9th Cir. 2010).

Only the evidence that was actually before the state court may be considered by a federal habeas court considering a claim that the state court should have held a competency hearing.  *Maxwell*, 606 F.3d at 566-68.  A good faith doubt about a defendant's competence arises "if there is substantial evidence of incompetence."  *Cacoperdo v. Demosthenes*, 37 F.3d 504, 510 (9th Cir. 1994), citing *United States v. Lewis*, 991 F. 2d 524, 527 (9th Cir. 1993).  "'[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required' and 'one of these factors standing alone may, in some circumstances, be sufficient.'"  *Maxwell*, 606 F. 3d at 568 (quoting *Drope*, 420 U.S. at 180).

Petitioner contends that the following should have raised a "bona fide doubt" as to his competence and triggered a hearing: (1) his behavior pre-trial; (2) his behavior during trial; (3) his decisions prior to the penalty phase and; (4) his history of mental illness, including his stays in a

**United States District Court**
For the Northern District of California

1  mental health hospital, and his diagnoses of brain damage, paranoid schizophrenia, and borderline

2  personality disorder.

3      1.      Pre-Trial Behavior

4      To begin with, Petitioner argues that his pre-trial behavior should have created a good faith

5  doubt in the trial judge's mind as to his competence.  Specifically, Petitioner points to an exchange

6  he had with the trial judge regarding his attorney during a pre-trial hearing.

7          THE DEFENDANT:  We have a problem, though, Judge, you
        know, with the lawyer and stuff.  I don't want him.  You know,
8          because nobody can fill my duties and tell me how I feel.  See what
        I'm saying?  You know, we get a confrontation about my case.  You
9          know, I don't feel like, you know, he tells me today he can feel for me,
        you know, but he can't feel for me and what I want to say and do.
10         And any other lawyer. . .

11         THE COURT:  Any other lawyer?

12         THE DEFENDANT:  Any other lawyer can . . .

13         THE COURT: Cannot?

14         THE DEFENDANT: Cannot, you know, feel my feelings or
        talk for me.

15
        THE COURT: But you do want to have counsel represent you?
16
        THE DEFENDANT: No, I'm here, you know, if they going to
17         come and talk this same whole stuff.

18         THE COURT: What other way would you suggest?

19         THE DEFENDANT: I don't know.

20         THE COURT: Mr. Veale [Petitioner's trial counsel], are you
        ready to proceed on Monday?
21
        MR. VEALE: I am, Judge, yes.
22

23  RT at 28.

24      2.      Behavior During Trial

25      During voir dire, the proceedings were halted when Petitioner had a bad headache.  RT at

26  1514.  He subsequently appeared in court dressed in his jail attire.  When questioned as to why,

27  Petitioner replied "I didn't want to dress this morning, Judge."  RT at 1516.

28

3.      Pre-Penalty Phase

Prior to the start of the penalty phase, Petitioner made two decisions that he argues created doubt as to his competency.  First, he requested that he be excused from appearing at the penalty phase due to headaches that he had been experienced during trial.  Petitioner's counsel stated to the trial court:

> He has indicated to me earlier that, as a matter of fact, before the trial began, that he wasn't sure if was going to be able to sit through it; that he was afraid that he would develop some headaches and things like that, which he has been subject to.  And he has noticed that he is feeling that way now and he would ask that the Court allow him to be accented [sic] from this proceeding because it's going to be difficult medically for him to sit here with any comfort because of his various conditions which he suffers from.

RT at 2870.

In response to questioning from the trial court, Petitioner stated that he could not sit through a discussion of his childhood, and requested excusal from the proceedings even after the trial court stated that Petitioner was putting his counsel in an "awkward situation not to have you available so that he can confer with you as the evidence unfolds." RT at 2871.  Ultimately, the trial court required Petitioner to be present at the penalty phase.

Second, Petitioner refused to waive the physician-patient privilege and allow his expert witnesses to testify as to his state of mind at the time the crimes were committed.[3]  The trial court informed Petitioner that he "may be putting Mr. Veale [Petitioner's attorney] in an exceptionally difficult decision here to put forth the best possible argument in your behalf." RT at 2842.  Veale himself stated that he did not "believe it should be up to Mr. Taylor, now, with all due respect to him, to make a decision about how this case should proceed now" because he did not "believe that [Petitioner] is in the position to best know how" to convince the jury to impose a sentence of life without parole instead of death.  RT at 2844.  When asked as to whether he had considered the impact of his decision Petitioner stated:

―――――――――――――――――

[3] Petitioner's mental health experts were permitted to testify about Petitioner's mental health history and their evaluations of him.

**United States District Court**
For the Northern District of California

> Yes, I thought of that, but I was – I don't know – okay.  I was speaking to these people, I was speaking – oh well, I was up on the impression that – how can I say this, that they was going to see, you know, if I had any problems.  I didn't think they was going to come, you know, in and relate to what I said.  I don't know if I am making sense.

RT at 2840-41.

### 4.   Mental Health History

The final evidence Petitioner points to was presented during the penalty phase trial.  First, Dr. Carolyn Block testified that Petitioner had been institutionalized at the Tolliver Mental Health Center in December 1984, one month prior to Vasquez's murder.  RT at 3401-02.  Prior to this point, Petitioner had been convicted of various assaults and jailed, where he attempted suicide.  RT at 3421-23.  At Tolliver, he was diagnosed with paranoid schizophrenia and anti-social behavior with paranoid traits.  RT at 3401-02, 3423.  Although it was then recommended that Petitioner spend additional time at a state mental hospital, he did not.  RT at 3424.

Dr. Block also testified that she diagnosed Petitioner with borderline personality disorder.  According to her testimony, such a condition – particularly at times of stress – could manifest in transient psychosis, unstable mood conditions and possible insanity.  RT at 3379-3444.  She also testified that Petitioner had "significant, cognitive problems" and that at times Petitioner "suffer[ed] some loss of cognitive control."  RT at 3387, 3395-96.

In addition, neurophsychologist Dr. Alexander Nemeth assessed Petitioner and testified during the penalty phase.  Dr. Nemeth testified that he "found a distinct discrepancy between functioning on [perceptual] tasks versus functioning on verbal tasks, and the discrepancy was large enough to suspect neurologic causes, that is brain damage, mild, mind you, but clearly diagnosable neurologic impairment."  RT at 3498.

Dr. Nemeth also testified that, based on his research background and his assessment of Petitioner, he found that Petitioner had personality changes that "typically occur[]" after brain trauma or brain injury, such as "impulsiveness, abrupt breakdown of impulse control, mood swings, sudden moods of depression or of elated mood, depression, social withdrawal."  RT at 3499.  In support of his analysis, Dr. Nemeth pointed in part to Petitioner's exposure "to physical violence

United States District Court
For the Northern District of California

from the age of five, through fights, some accidents and a lot of beatings," including "at [least] one known episode of prolonged unconsciousness." RT at 3503. Dr. Nemeth specifically noted that Petitioner suffered "exposure to physical violence to the head," RT at 3504, and noted that Petitioner was also "severely disturbed, emotionally" for reasons other than brain dysfunction. RT at 3499.

Dr. Nemeth testified as to a particular interaction that occurred when he was examining Petitioner.

> Dr. Nemeth: . . .[T]here was a particular episode during the evaluation which was very, very diagnositical for me.
>
> It was during the latter part of the second session with Mr. Taylor, where up to that point he was very cooperative and friendly, and pleasant, and I was even surprised at his frustration tolerance was holding up as it was, and then he very abruptly became uncooperative, angry, used profane language, and declared himself unwilling to continue.
>
> And this was not really connected in, to my awareness, with any of the content of the interview.
>
> It could have been, of course, because he was talking about his family or talking about some of the episodes of fights and police was called, and so it could be – I cannot rule that out, but the abruptness of the mood change, of the impulsiveness, of the sudden irritability to the point of total break in his behavior and lack of cooperation, that, to me, is clearly organic.
>
> In other words, that, to me, is one among a number of other signs, or one important sign of – that we are dealing with [a] neurological component, which means some degree of brain damage.

RT at 3500-01.

5.   Analysis

As stated *supra,* "a trial judge must conduct a competency hearing whenever the evidence before him raises a bona fide doubt about the defendant's competence to stand trial, even if defense counsel does not ask for one." *Odle v. Woodford*, 238 F. 3d 1084, 1087 (9th Cir. 2001). This Court must "review the record to determine whether evidence before the state court raised a "bona fide doubt" that [Petitioner] was competent to stand trial. *Id.* (citing *Pate*, 383 U.S. at 385). A good faith doubt about a defendant's competence arises if "'a reasonable judge, situated as was the trial court judge whose failure to conduct an evidentiary hearing is being reviewed, should have experienced doubt with respect to competency to stand trial.'" *Maxwell*, 606 F.3d at 568 (quoting *Kaplany v.*

**United States District Court**
For the Northern District of California

1   *Enomoto*, 540 F. 2d 975, 983 (9th Cir. 1976)).  "'[E]vidence of a defendant's irrational behavior, his

2   demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in

3   determining whether further inquiry is required,' and 'one of these factors standing alone may, in

4   some circumstances, be sufficient.'" *Id.* (quoting *Drope*, 420 U.S. at 180).

5         As the record set out *supra* demonstrates, there was ample evidence that should have raised a

6   bona fide doubt as to Petitioner's competence.  Perhaps the most compelling evidence was

7   Petitioner's mental health history.  Shortly before the crimes were committed, Petitioner had

8   attempted suicide and been institutionalized at a mental health center, where he was diagnosed with

9   paranoid schizophrenia.  RT at 3401-23.  That evidence alone should have triggered further inquiry

10  into Petitioner's competency.  The diagnostic criteria for paranoid schizophrenia includes frequent

11  experience of auditory hallucinations or preoccupation with at least one delusion.  Such a diagnosis

12  clearly raises a bona fide doubt that a defendant has: (1) a rational, as well as factual, understanding

13  of the nature and object of the proceedings against him; (2) the present ability to consult with

14  counsel with a reasonable degree of rational understanding; and (3) the present ability to aid in the

15  preparation of his defense.  *See Drope*, 420 U.S. at 171–72.  Furthermore, significant other evidence

16  regarding Petitioner's mental state, such as his likely brain damage and Dr. Block's testimony

17  regarding Petitioner's diagnosis of borderline personality disorder and its potential to manifest in

18  transient psychosis, unstable mood conditions and possible insanity, should have raised an issue as

19  to his competency.  *See, e.g.*, *Odle*, 238 F.3d at 1089 (finding that competency hearing should have

20  been held where clinical evidence raised a doubt as to defendant's competency and defendant had an

21  extensive history of mental impairment).[4]

22        The Court emphasizes that it is not suggesting that every person diagnosed with

23  schizophrenia is incompetent to stand trial.  Indeed, this Order does not even address whether

24  Petitioner was actually incompetent.  Rather, the sole issue before the Court is whether the evidence

25

26

27        [4] Although some of the evidence emerged after the guilt phase and before the penalty phase,
the evidence which should have triggered a hearing was cumulative.  It raised a bona fide doubt as to
28  Petitioner's general competency as to both phases of the trial which were proximate in time.

**United States District Court**
For the Northern District of California

1    before the trial court should have triggered a *doubt* as to Petitioner's competency, such that a

2    hearing was warranted.

3         While the mental health evidence alone should have triggered a competency hearing, there

4    were also other indicators that should have led the trial court to doubt Petitioner's competency.  As

5    the Ninth Circuit has held, competence to stand trial "requires the mental acuity to see, hear and

6    digest the evidence, and the ability to communicate with counsel in helping prepare an effective

7    defense."  *Id.*  Petitioner's behavior at trial prior to the introduction of the mental health evidence at

8    the penalty phase called into question his ability to communicate with counsel to help prepare an

9    effective defense.

10        For example, Petitioner spoke incoherently to the trial court regarding his attorney during a

11   scheduling hearing, including stating that "I ain't got nothing to say to him.  How long will you be

12   around?  You know, I won't be around no attorney might as well say."  RT at 31.  In addition to

13   being incoherent, the statement indicated that Petitioner was not communicating with his attorney,

14   and competence to stand trial requires the ability to communicate with counsel.  *See, e.g., Odle*, 238

15   F.3d at 1089.  Petitioner later objected to his counsel's request for continuance, even though his

16   counsel stated it was necessary for proper trial preparation, and wore jail clothes to voir dire because

17   he "didn't want to dress."  RT at 1516.  Finally, Petitioner asked to be excused from the penalty

18   phase due to "headaches" and his various "conditions" and – over the objections of his own attorney

19   – did not allow his expert witness to testify about his state of mind at the time of the crime.  RT at

20   2870-71.  Given all of the information available, this Court finds that a reasonable jurist "'should

21   have experienced doubt with respect to competency to stand trial.'"  *Maxwell*, 606 F. 3d at 568

22   (quoting *Kaplany*, 540 F. 2d at 568).

23        Despite all of the above, Respondent contends that there was not evidence sufficient to raise

24   a bona fide doubt as to Petitioner's competency to stand trial.  The Court will address each of

25   Respondent's arguments.

26        To begin with, Respondent maintains that Petitioner's pre-trial ramblings to the trial court

27   represented frustration with his counsel, not an indication of possible incompetency to stand trial.  In

28   support of this argument, Respondent cites to *United States v. Mendez-Sanchez*, 563 F.3d 935, 947-

48 (9th Cir. 2009) and *Medina v. Singletary*, 59 F.3d 1095, 1107 (11th Cir. 1995).  Both cases, however, are distinguishable from the case at bar.  In *Mendez-Sanchez*, the Ninth Circuit determined that defendant's rambling conversations with the trial court did not trigger the need for a competency hearing.  563 F.3d at 947-48.  In that case, however, the trial court questioned defendant extensively about his understanding of the process, and specifically consulted with defendant's attorneys regarding defendant's competency and ability to assist in his defense.  *Id.*  In addition, there were no other indicators that should have raised a bona fide doubt as to defendant Mendez-Sanchez's competency.  Here, by contrast, the trial court did not confer with counsel as to Petitioner's competency and, as detailed *supra,* there was significant other evidence that should have triggered a competency hearing.

   *Medina* is also not relevant here.  In *Medina*, a competency hearing was held the day before trial and among other evidence, two psychiatrist reports confirming defendant's competency to stand trial were submitted.  59 F.3d at 1109.  Medina maintained on federal habeas that a further competency hearing was warranted, but because the claim was defaulted, it was not addressed on the merits.  *Id.* at 1111.

   Respondent also contends that Petitioner's wearing of jail attire should not have raised doubts as to his competency.  Respondent is correct that a defendant's choice to wear prison attire does not necessarily trigger a competency hearing.  *See, e.g. Davis v. Woodford*, 384 F.3d 628, 645 (9th Cir. 2003) (holding that a defendant's refusal to wear civilian clothes or sit in the courtroom did not give rise to a *sua sponte* duty to order a competency hearing).  In *Davis*, however, the trial judge questioned defendant at length about his decision, and was satisfied that it was rational.  *Id*. at 646.  Additionally, defendant Davis did not – unlike Petitioner – exhibit other potential indicia of incompetence, such as time in a residential mental health facility or a diagnosis of paranoid schizophrenia.

   Finally, Respondent argues that Petitioner's mental health history was not significant enough to have triggered a competency hearing.  First, Respondent points to the report of Dr. Ken Hjortsvang, a board-certified psychiatrist who examined Petitioner about six months prior to trial at his counsel's request.  Dr. Hjortsvang's report stated in relevant part:

1    |   I did not feel he [Petitioner] was insane at the time of the
2    |   commission of the crime.  I also felt he understood the nature and purpose of the court proceedings and he could stand trial.  I felt there could be some mild brain dysfunction.  I suggested an EEG and
3    |   neuropsychological testing which was subsequently done.

4    Second Amended Petition, Exh. 1, App. 58.

5         Dr. Hjortsvang's report was *not* presented to the trial court, and thus is not relevant here.

6    This Court must consider the evidence that was actually available and presented to the trial court

7    when determining whether a competency hearing should have been held.  *Maxwell*, 606 F. 3d at

8    566-568.  Furthermore, even if Dr. Hjortsvang's report had been submitted to the trial court, and the

9    trial court had concluded based on it that Petitioner was competent to stand trial, there was still

10   enough evidence presented subsequently that should have led to a bona fide doubt as to Petitioner's

11   competency.  The Supreme Court has held that if, at anytime during the trial, the trial court becomes

12   aware of circumstances which would lead a reasonable person to have a bona fide doubt as to the

13   defendant's competence, the trial court must suspend the proceedings and conduct a competency

14   determination hearing.  *Pate*, 383 U.S. at 385–86.  Moreover, even when a defendant is competent at

15   the commencement of his trial, "[the] trial court must always be alert to circumstances suggesting a

16   change" that would render the defendant incompetent to stand trial.  *Drope*, 420 U.S. at 181.

17        Respondent also maintains that Petitioner's history of mental illness did not necessarily raise

18   a bona fide doubt as to his competence.  Again, the cases relied upon by Respondent are

19   distinguishable from Petitioner's case.  For example, in *United States v. Leggett*, the trial court held

20   a competency hearing after defendant was convicted of assault but before sentencing.  162 F 3d 237,

21   240-41 (3d Cir. 1998).  On appeal, defendant argued that the trial court should have held a *sua*

22   *sponte* competency hearing prior to the start of trial.  The Third Circuit disagreed, finding that, even

23   though a competency hearing had not been held, the trial court had assessed defendant's ability to

24   assist in his defense prior to trial and confirmed defendant's capability on the record.  *Id.* at 242.

25   There was no such assessment on the record of Petitioner's competency during his capital trial.

26   Furthermore, there were no medical reports that might have raised a red flag as to defendant

27   Leggett's competency; rather, defendant himself had alleged he had brain damage and schizophrenia

28   during a pre-trial hearing, statements that the Third Circuit concluded were "self-serving" and

United States District Court

For the Northern District of California

1  "undercut by Leggett's own admission that his impairments did not affect his comprehension of

2  legal concepts." *Id*. at 243-44.

3        Respondent also relies on *United States v. Lebron*, 76 F.3d 29 (1st Cir. 1996), where the

4  defendant argued that the trial court should have held a competency hearing.  The First Circuit

5  disagreed, finding that although there had not been a formal competency hearing, two psychiatrist

6  reports and defendant's attorney represented to the trial court that defendant was competent to stand

7  trial.  *Id.* at 30-31.  Moreover, the trial court had "carefully and painstakingly sought, commencing

8  with defendant's initial appearance before him, to ascertain whether there was any question of

9  mental competency and to protect [defendant]'s due process rights."  *Id.* at 32.  Here, by contrast,

10  the record is silent as to whether the trial court considered Petitioner's competency and there were

11  no expert reports confirming competency submitted to the trial court.  The record does not reveal,

12  nor does Respondent cite to, any on-the-record considerations of Petitioner's competency by the trial

13  judge, nor to any questions of counsel by the trial judge as to Petitioner's competency.

14        In sum, the Court finds and concludes that a reasonable trial judge, given all of the available

15  evidence regarding Petitioner's behavior and particularly his mental health history, should have had

16  a  bona fide doubt concerning Petitioner's competence.  *Pate*, 383 U.S. at 385 (1966); *accord*

17  *Maxwell* 606 F.3d at 568.  The Court does not reach this decision lightly, and realizes that neither

18  the trial court nor Petitioner's counsel questioned his competency during the lengthy trial.  As the

19  Ninth Circuit has held, however, while the observations of those interacting with Petitioner are

20  entitled to "substantial weight", they "cannot overcome the significant doubt about [] competence

21  raised by the clinical evidence."  *Odle*, 238 F.3d at 1089.  The Court also again emphasizes that it is

22  not finding that Petitioner was in fact incompetent to stand trial.  "But [] a reasonable jurist, given

23  the information available, would have developed doubts on this score."  *Id.*  Where, as here, a

24  petitioner has engaged in incomprehensible ramblings and the record indicates a history of severe

25  mental illness, including a diagnosis of paranoid schizophrenia, "an inquiry into whether he

26  possesses the mental acuity to participate in the proceedings is the reasonable and appropriate course

27  of action."  *Id.*  Failure to do so was a denial of due process, and this claim must therefore be

28  granted.

**United States District Court**
For the Northern District of California

1    While the Court grants relief on this claim, it will defer determination of a remedy pending

2    further briefing from the parties.  When a habeas petition is granted on the ground that a competency

3    hearing should have been held, "if the record contains sufficient information upon which to base a

4    reasonable psychiatric judgment," a retroactive competency hearing may be held by the state court,

5    rather than retrying the Petitioner.  *Odle*, 238 F.3d at 1089-90.  Otherwise, the Petitioner must either

6    be released or retried.  *See Maxwell*, 606 F.3d at 577.  A briefing schedule for this issue will be set at

7    the end of this Order.

8    B.    Claims 12(C) and 12(D)

9    In Claims 12(C) and (D), Petitioner maintains that the prosecutor committed misconduct

10   during closing argument.  Specifically, Petitioner argues that the prosecutor: (1) shifted the burden

11   of proof; (2) argued to the jury there were only two possible verdicts and; (3) misrepresented the

12   evidence.

13   The Supreme Court has held that when reviewing a habeas claim of prosecutorial

14   misconduct, the relevant inquiry is not whether "the prosecutor's remarks were undesirable or even

15   universally condemned."  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted).

16   Rather, the issue "is whether the prosecutors' comments 'so infected the trial with unfairness as to

17   make the resulting conviction a denial of due process.'"  *Id.* (citing *Donnelly v. DeChristoforo*, 416

18   U.S. 637 (1974)).  "Moreover, the appropriate standard of review for such a claim on writ of habeas

19   corpus is the narrow one of due process, and not the broad exercise of supervisory power."  *Id.*

20   (citations omitted).  Relief is not warranted unless a petitioner establishes that any purported

21   instructional or prosecutorial error had a substantial or injurious effect or influence in determining

22   the jury's verdict.  *See Brecht*, 507 U.S. at 638.

23   1.    Burden of Proof

24   As discussed *supra*, Petitioner maintained at trial that the prosecution had not met its burden

25   of proof.  During closing argument, defense counsel suggested that the unidentified fingerprints and

26   footprint indicated that another person might have killed Vasquez.  RT at 2701-2708, 2712.  In

27   rebuttal, the prosecutor stated: "Coconspirator kills victim in rage.  What evidence is there of that?

28   Is it a possibility?  I imagine it is a possibility."  RT at 2735.  Defense counsel objected on the

United States District Court

For the Northern District of California

1   grounds that this statement indicated that the burden was on the defense to prove Petitioner's

2   innocence.  This objection was overruled by the trial court.  RT at 2735-36.

3   　　　　Petitioner cannot demonstrate that the prosecutor's comments "so infected the trial with

4   unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181

5   (internal citations and quotations omitted).  The prosecutor's statement did not improperly shift the

6   burden of proof onto the defense; rather, the prosecutor was commenting on the state of the

7   evidence.  More specifically, the prosecutor was commenting on the weakness of the defense theory

8   of the case that another assailant had been present at the crime.  Neither are improper.  *See, e.g.*

9   *United States v. Cabrera*, 201 F.3d 1243, 1250 (9th Cir. 2000); *United States v. Robinson*, 485 U.S.

10  25, 26-34 (1988); *Bashor v. Risley*, 730 F.2d 1228, 1240 (9th Cir. 1984) (holding that a prosecutor

11  may comment on the absence of evidence so long as there is sufficient evidence to support the

12  prosecutor's version of events).

13  　　　　In addition, even if the prosecutor had misstated the applicable law, Petitioner does not argue

14  that the jury was mis-instructed on the applicable law.  A prosecutor's mischaracterization of the law

15  is less likely to render a trial fundamentally unfair than if the trial court issues the instruction

16  erroneously.

17  　　　　　　　　[A]rguments of counsel generally carry less weight with a jury
    　　　　　　than do instructions from the court.  The former are not evidence, and
18  　　　　　　are likely viewed as the statements of advocates; the latter, we have
    　　　　　　often recognized, are viewed as definitive and binding statements of
19  　　　　　　the law.  Arguments of counsel which misstate the law are subject to
    　　　　　　objection and to correction by the court.  This is not to say that
20  　　　　　　prosecutorial misrepresentations may never have a decisive effect on
    　　　　　　the jury, but only that they are not to be judged as having the same
21  　　　　　　force as an instruction from the court.

22  *Boyde v. California,* 494 U.S. 370, 384-85 (1990) (citations omitted); *see also United States v.*

23  *Rodrigues,* 159 F. 3d 439, 451 (9th Cir. 1998) (confirming that "[t]he jury is regularly presumed to

24  accept the law as stated by the court, not as stated by counsel").  Here, Petitioner does not argue that

25  the jury was not properly instructed regarding burden of proof.[5]  In addition, the jury was instructed

26  _____

27  　　　　　[5] The jury was instructed regarding burden of proof as follows:

28  　　　　　　　　A defendant in a criminal action is presumed to be innocent until the contrary
    　　　　　is proved, and in the case of a reasonable doubt whether his guilt is satisfactorily

United States District Court

For the Northern District of California

1    to follow the trial court's instructions, and that statements made by the attorneys were not evidence.

2    RT at 2754-55.  Accordingly, there is no support for Petitioner's claim that the prosecutor's

3    comments rose to the level of reversible misconduct.

4           2.     Possible Verdicts

5           Petitioner contends that the prosecutor argued that there were only two verdicts possible: not

6    guilty and felony murder.  The prosecutor's comments at issue here are as follows:

>               And when you hear the instructions and when you hear the
>               law, when you consider the evidence notwithstanding the serious
>               nature of this case you will see that it is an all-or-nothing case.  There
>               is no question in this case, there will be no instructions, there is no law
>               indicating the consideration of any lesser offense. . . .
>
>               [I]n this case, based upon the facts presented, it is either
>               murder in the first degree or nothing at all.  The defendant is either
>               guilty of felony murder or not guilty.
>
>               So in many respects, your task, your choice, is a simple one.
>               And I don't mean to belittle the process you must go through, the
>               thought you must give to this case.  I am merely indicating that based
>               on the evidence present and the law with which you will be instructed
>               with a choice either the defendant was there or he was not.  If he was
>               there he was guilty of the offenses charged.

16   RT at 2654-55.

17          According to Petitioner, this amounts to misconduct because it mis-stated the law, and did

18   not acknowledge the difference between simple felony murder and felony murder with special

19   circumstances.  Specifically, Petitioner argues that the prosecutor's comments did not make clear

20   that to find Petitioner guilty of capital murder (in this case, felony murder with special

---

>               shown, he is entitled to a verdict of not guilty.  This presumption places upon the
>               State the burden of proving him guilty beyond a reasonable doubt.
>                     . . .
>
>               It is never the duty or burden of a criminal defendant to prove his innocence;
>               therefore, it is not his burden to establish the existence of any particular reasonable
>               innocent interpretation of the evidence.  The burden is always on the prosecution to
>               prove every element of a charge beyond a reasonable doubt.  You may not employ
>               speculation, conjecture, or guesswork in order to find to be true any inference urged
>               by the prosecution.

RT at 2766-67.

1  circumstances), the jury needed to find more than simply that Petitioner was present at the crime

2  scene.

3        Petitioner, however, cannot demonstrate that the prosecutor's comments "so infected the trial

4  with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at

5  181 (internal citations and quotations omitted).  Prosecutorial comments must be examined in

6  context. *Williams v. Borg,* 139 F.3d 737, 744 (9th Cir. 1998).  Later in his closing, the prosecutor

7  discussed in detail the evidence against Petitioner, the basis for felony murder and first-degree

8  murder, the special circumstances, and the required intent to kill.  RT at 2672-2685.  When reviewed

9  in its entirety, the prosecutor's closing argument did not misstate the law, nor ignore the issue of

10  special circumstances.

11        In addition, as discussed *supra*, even if the prosecutor's comments were in error, Petitioner

12  does not argue that the jury was mis-instructed on the applicable law.  RT at 2767-73.  A

13  prosecutor's mischaracterization of the law is less likely to render a trial fundamentally unfair than if

14  the trial court issues the instruction erroneously. *Boyde,* 494 U.S. at 384-85.  Here, Petitioner does

15  not argue that the jury was not properly instructed regarding felony murder and special

16  circumstances.  In fact, Petitioner cites to the jury instructions as properly stating the applicable law.

17  *See* Petitioner's Merits Briefing at 18 (citing RT at 2769-70).  In light of the full record, the

18  prosecutor's comments did not rise to the level of reversible misconduct.  Because the comments did

19  not *"so infect[] the trial with unfairness as to make the resulting conviction a denial of due process,"*

20  this subclaim must be denied. *Darden,* 477 U.S. at 181 (internal citations and quotations omitted).

21        3.    <u>Representation of Evidence</u>

22        Petitioner also argues that the prosecutor misstated the evidence at trial by arguing that there

23  was no evidence of additional perpetrators of the crime.  According to Petitioner, this was

24  misconduct because there were fingerprints and shoe prints at the scene that did not match

25  Petitioner.  In addition, Petitioner notes that a criminologist testified it was "possible" there were

26  two different perpetrators, and that the coroner testified the injuries to the victim were consistent

27  with those inflicted by an insane person.  Because Petitioner did not raise an insanity defense, he

28  argues that the coroner's testimony is also evidence of another killer.

United States District Court

For the Northern District of California

While a prosecutor may not make statements of fact not supported by evidence, he or she may suggest to the jurors that they make "reasonable inferences" from evidence that is presented during trial.  *See, e.g.*, *United States v. Sayetsitty,* 107 F. 3d 1405, 1409 (9th Cir. 1997) (confirming that prosecutors are allowed "wide latitude" in closing argument, including "latitude that embraces reasonable inferences from the evidence presented at trial") (internal quotations and citations omitted).  Moreover, "criticism of defense theories and tactics is a proper subject of closing argument."  *Id.*

The prosecutor's comments at issue here are as follows:

> The defense has no burden, has no responsibility to present evidence, but they chose to rely upon the reality, the evidence presented in this case, and then would call upon you to speculate or to engage in guesswork and to create a second person or a possibility of a second person.

> Now, if there was a second person, would it make any difference based upon what has been proved in this case, because there may be a possibility and it is for you to determine whether or not it is a reasonable or plausible possibility, based upon the evidence that you have been presented with, that a second or third or fourth or how about 100 people were involved in this case.

> Based upon the evidence that you have been presented with, is that a reasonable conclusion?

> When you consider that at the point of entry – now, perhaps that would be a more reasonable argument if the defendant's prints were not found at the point of entry, were not found on that latch by the cut, was not found on the Plexiglas, but in some other area of the home.  In the bathroom or in some other place.

> But the prints of the defendant are found at the point of entry, which is why perhaps [defense counsel] concedes, in essence, in his rather artistic display of going through that door of a burglary, which in fact the defendant literally did in that case.

> Were his print or shoe print impression, latent print, shoe print of a shoe, consistent with a shoe that Mr. Taylor possessed.

> And you see it really makes no difference because there is no evidence, competent evidence to conclude the first smokescreen that [defense counsel] throws at you.

> Well, maybe there was someone else involved, because [the criminologist] could not eliminate eight prints in a home the person lived in for 40 years, and [the criminologist] could not come up with a list of every possible person who may have been in that home during that period of time.

> And [the criminologist] didn't compare these eight prints with perhaps the husband who had died some years ago, with other who may have been in the home.
>
> It's real convenient, it's real easy in the case like this, Miss Vasquez can't talk, to throw up that smokescreen.

RT at 2722-24.

Petitioner cannot demonstrate that these challenged comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 477 U.S. at 181 (internal citations and quotations omitted). As discussed *supra,* prosecutorial comments must be examined in context. *Williams,* 139 F.3d at 744. In addition, reviewing courts are cautioned not to infer that the jury will draw the most damaging meaning of a challenged comment "from the plethora of less damaging interpretations." *Id.* (citing *Donnelly,* 416 U.S. at 647).

Here, the prosecutor did not misstate the evidence introduced at trial. Rather, after acknowledging the evidence regarding the additional unidentified fingerprints, he argued that their presence was to be expected in a home that had been occupied for 40 years, and that the presence of those fingerprints did not nullify the evidence supporting Petitioner's guilt. These comments are well within the "wide latitude" that prosecutors are allowed during closing argument, including the latitude to urge jurors to make "reasonable inferences" from the evidence. *Sayetsitty,* 107 F.3d at 1409. In addition, prosecutors are permitted to – as the prosecutor did here – criticize defense theories. *Id.* Accordingly, because Petitioner cannot demonstrate that the prosecutor's comments violated due process or prejudiced the verdict, this subclaim must be denied.

C.     Claim 15(B)

In Claim 15(B), Petitioner argues that his right to due process was violated by an erroneous aiding and abetting instruction. According to Petitioner, this instructional error likely led to the jury's finding of guilt.

The instruction at issue reads as follows:

> One who aids and abets is not only guilty of the particular crime that to his knowledge his confederates are contemplating committing, but he is also liable for the natural and reasonable or probable consequences of any act that he knowingly aided and encouraged.

United States District Court
For the Northern District of California

RT at 2763.

This instruction was taken from the California Jury Instructions ("CALJIC") applicable at the time of Petitioner's trial, but it was held to be erroneous in *People v. Hammond*, 181 Cal. App. 3d 463, 465-69 (1986), and subsequently revised.  Specifically, the *Hammond* Court found that the instruction was "potentially ambiguous in its failure to inform the jury of its fact-finding function in determining the question of vicarious liability for the unplanned related offense."  *Id.* at 469.

The California Supreme Court addressed this claim in a reasoned opinion on direct appeal.[6] As to the erroneous instruction, the Court found that:

> Any [instructional] error . . . was harmless beyond a reasonable doubt. [citations omitted]. . . . [The jury was required] to find that defendant intended to kill Ms. Vasquez in order to find the special circumstances true.  The jury was instructed that in order to find any of the special circumstances to be true it must find that "the defendant intended to kill a human being."  In finding the robbery and burglary special circumstances true, the jury thus determined that defendant intended to kill when he engaged in the commission of burglary and robbery. Since the factual question posed by the omitted instruction was necessarily resolved adversely to defendant by the jury's finding of intent to kill, there can be no prejudice to defendant.

*Taylor*, 52 Cal. 3d at 733.

To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  *See Estelle v. McGuire*, 502 U.S. 62, 72 (1991); *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974) ("'[I]t must be established not merely that the instruction is undesirable, erroneous or even "universally condemned," but that it violated some [constitutional right].'").  The instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  *See Estelle*, 502 U.S. at 72.  In other words, the court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  *United States v. Frady*, 456 U.S. 152, 169 (1982) (citing *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977)); *Prantil v. California*, 843 F.2d

---

[6] As discussed *supra*, this is a pre-AEDPA case where the Court is required to apply *de novo* review.  *Swan*, 6 F.3d at 1379.  Nonetheless, the California Supreme Court's review of California law is relevant here.

314, 317 (9th Cir.1988); *see, e.g., Middleton v. McNeil*, 541 U.S. 433, 434-35 (2004) (per curiam) (no reasonable likelihood that jury was misled by single contrary instruction on imperfect self-defense defining "imminent peril" where three other instructions correctly stated the law). If an error is found, the court also must determine that the error had a substantial and injurious effect or influence in determining the jury's verdict, *see Brecht*, 507 U.S. at 637, before granting relief in habeas proceedings. *See Calderon v. Coleman*, 525 U.S. 141, 146-47 (1998).

Petitioner maintains that the challenged instruction violated his due process rights. According to Petitioner, the jury likely found him to be an aider and abettor, and the instruction led the jury to assume – rather than find – that murder was a natural and probable consequence of the robbery.

Here, the Court assumes that the instruction was erroneous. *See Hammond*, 181 Cal. App. 3d at 465-69. Therefore, the Court must determine "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process." *Estelle*, 502 U.S. at 72.

The Court finds that the instructions of the trial court, taken in their entirety, would not have allowed the jury to find Petitioner guilty of the charged crimes without a specific finding that he intended to kill. As the Supreme Court and Ninth Circuit have held, federal courts must accept a state Supreme Court's identification of the elements of a state criminal offense. *Illinois v. Vitale*, 447 U.S. 410, 416 (1980); *Solis v. Garcia*, 219 F.3d 922, 927 (9th Cir. 2000). Here, the jury found true two special circumstances: (1) murder in the commission or attempted commission of a robbery; and (2) murder in the commission or attempted commission of a burglary. *Taylor*. 52 Cal. 3d at 729. Consistent with state law, the jury was instructed that in order to find true the special circumstances, it had to find that the "the defendant intended to kill a human being." *Taylor,* 52 Cal. 3d at 733. Therefore, to the extent that the aiding and abetting instruction was ambiguous, any ambiguity was resolved by the jury's necessary finding that Petitioner intended to kill Vasquez. *See, e.g., Solis*, 219 F. 3d at 927-928 (finding that ambiguous aiding and abetting instructions did not amount to reversible error when other instructions given required the jury to find the defendant acted with the requisite intent).

Finally, Petitioner argues that the jury "likely" found him to be an aider and abettor and thus was misled by the erroneous instruction. *See, e.g.*, *Estelle,* 502 U.S. at 72 (stating that reviewing courts must consider "whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.") (internal citations and quotations omitted)). This argument, however, is without merit. Absent the unidentified fingerprints and footprint in the house (which were not surprising given that Vasquez had lived in the home for 40 years), there was no significant evidence of another perpetrator. Based on the evidence presented in the case, this Court cannot find that there was a "reasonable likelihood" that the jury found Petitioner guilty under a theory of aider and abettor liability.[7] *Id.* Moreover, as discussed *supra,* the fact that the jury found true two special circumstances confirms that the jury found the requisite intent to kill, even with the ambiguous aiding and abetting instruction. In sum, considering the challenged instruction in the context of the trial record and the instructions as a whole, it did not violate Petitioner's due process rights. *See Estelle*, 502 U.S. at 72; *Brecht*, 507 U.S. at 638. This claim is denied.

## V.   CONCLUSION

For the foregoing reasons, Claims 12(C), 12(D) and 15(B) are **DENIED**, and Claim 3(A) is **GRANTED**. Within twenty-one (21) days of the date of this Order, the parties should meet and confer, and submit a proposed briefing schedule regarding the issue of available relief for Claim 3(A).

IT IS SO ORDERED.

Dated: February 26, 2016

_____
EDWARD M. CHEN
United States District Judge

---

[7] The jury's deliberation of four days does not indicate, as Petitioner asserts, that the jury believed another person was responsible for killing Vasquez. Petitioner does not demonstrate that four days is an unusually long period of deliberation in a capital case. In addition, the four days of deliberation could well indicate that the jury was carefully considering each of the multiple charges against Petitioner. *See Taylor*, 52 Cal. 3d at 729.

United States District Court
For the Northern District of California